**PACKARD PRESS, INC. (formerly Packquisition Corporation), Appellant,**

**v.**

**HEWLETT–PACKARD COMPANY, Appellee.**

No. 00–1076.

United States Court of Appeals, Federal Circuit.

Sept. 25, 2000

---

5. Plaintiff's motion for fees and costs related      to the appeal is DENIED.

1354

Timothy D. Pecsenye, Blank, Rome, Cominsky & McCauley, LLP, of Philadelphia, Pennsylvania, argued for appellant. With him on the brief was Rachel L. Brendzel.

Elizabeth A. Sheets, Hewlett Packard Company, of Palo Alto, California, argued for appellee. Of counsel was John Tiedge.

Before MAYER, Chief Judge, CLEVENGER and RADER, Circuit Judges.

CLEVENGER, Circuit Judge.

Hewlett–Packard Company ("HP") opposes the application by Packard Press, Inc. ("Packard") to register the service mark PACKARD TECHNOLOGIES for data processing services. The United States Patent and Trademark Office Trademark Trial and Appeal Board ("Board") sustained the opposition on the ground that consumers are likely to confuse PACKARD TECHNOLOGIES with HP's marks HEWLETT–PACKARD and HEWLETT–PACKARD and design. *See Hewlett–Packard v. Packquisition,*[1] Opposition No. 106,540, slip op. at 9, 1999 WL 792477 (TTAB Sept. 27, 1999). Because the Board erred in analyzing the HEWLETT–PACKARD marks and we are unable to determine if the Board applied the correct legal test when analyzing the relatedness of the goods, we vacate the Board's decision and remand the case to the Board for further proceedings.

I

HP owns 13 federal registrations for the marks HEWLETT–PACKARD and HEWLETT–PACKARD and design for a wide variety of computer hardware products, including computers, data processing systems, data acquisition systems, printers, printer accessories, facsimile machines, medical equipment, and associated software. Two of HP's marks are also registered for data processing consulting services.

Packard is a commercial printer specializing in legal, municipal, and financial printing, *e.g.,* printing prospectuses, reports, and financial statements. Packard's customers include securities brokers, financial houses and law firms. Since 1957, Packard has offered its services, which include computer services to aid in its commercial printing business, under its marks PACKARD and design, U.S. Trademark Registration No. 1,828,225 and PACKARD, U.S. Trademark Registration No. 1,816,811. Packard intends to expand its products and services beyond traditional printing services to provide its customers with other means of processing information—*e.g.,* through CD–ROMs and publishing on the Internet. To differentiate these new services from its traditional printing services, Packard selected the mark PACKARD TECHNOLOGIES.

In October 1995, Packard filed intent-to-use application number 75/000,036 to register the service mark PACKARD TECHNOLOGIES for data processing and information processing, electronic transmission of data and documents via computer terminals, electronic transmission of messages and data, and data and digital information (media duplication of), and conversion from one media form to another media (document data transfer and physical). HP filed an opposition under section 2(d) of the Trademark Act to the registration of Packard's mark, on the ground that the

---

1. During the pendency of this appeal, Packquisition Corporation changed its name     of record to Packard Press, Inc.

mark was confusingly similar to HP's 13 previously registered marks: HEWLETT–PACKARD and HEWLETT–PACKARD and design.

The Board sustained the opposition, holding that there was a likelihood of confusion between PACKARD TECHNOLOGIES and HP's HEWLETT–PACKARD marks. *See Hewlett–Packard,* slip op. at 9, 1999 WL 792477. The Board found that HEWLETT–PACKARD and PACKARD TECHNOLOGIES are identical or highly similar marks, and that HP's goods were related to Packard's services because HP's computer products are goods that "would be used in connection with the services in [Packard's] application." *Id.* at 7, 1999 WL 792477. The Board further assumed that HP's goods and Packard's services may be marketed through some of the same channels, to the same classes of purchasers. *See id.* at 8, 1999 WL 792477. Because HP did not submit any evidence in support of its argument that its HEWLETT–PACKARD marks were famous, the Board declined to consider that factor. *See id.* The Board also declined to consider Packard's evidence on concurrent use with no actual confusion with respect to its related mark, PACKARD for computer services. *See id.* This appeal followed, conferring jurisdiction pursuant to 28 U.S.C. § 1295(a)(4) (1994).

## II

■ The United States Patent and Trademark Office (PTO) may refuse to register a trademark that so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d) (1994). Whether a likelihood of confusion exists is a question of law, based on underlying factual determinations. *See Lloyd's Food Prods., Inc. v. Eli's, Inc.,* 987 F.2d 766, 767, 25 USPQ2d 2027, 2028 (Fed. Cir.1993); *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.,* 963 F.2d 350, 352, 22 USPQ2d 1453, 1455 (Fed.Cir.1992). Likelihood of confusion is determined on a case-specific basis, applying the factors set

out in *In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973) (enumerating factors that may be considered when relevant evidence is of record). The *DuPont* factors are: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which and buyers to whom sales are made, *i.e.,* "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark (sales, advertising, length of use); (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time during and conditions under which there have been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used (house mark, "family" mark, product mark); (10) the market interface between applicant and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion, *i.e.,* whether *de minimis* or substantial; and (13) any other established fact probative of the effect of use. *See id.*

■ Our review of the Board's ultimate conclusion is plenary. *See Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1569, 218 USPQ 390, 394 (Fed.Cir. 1983). We uphold the Board's factual findings with respect to the *DuPont* factors unless they are unsupported by substantial evidence. *See Dickinson v. Zurko,* 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d 1930, 1937 (1999); *Recot, Inc. v. M.C. Becton,* 214 F.3d 1322, 1327, 54 USPQ2d 1894, 1897 (Fed.Cir.2000) (stating that factual findings of the TTAB are reviewed for substantial evidence); *In*

*re Gartside,* 203 F.3d 1305, 1315, 53 USPQ2d 1769, 1775 (Fed.Cir.2000).

## A

The first *DuPont* factor we consider is the similarity or dissimilarity of the marks. Packard argues that the Board erred by focusing only on the "Packard" component of both the PACKARD TECHNOLOGIES and HEWLETT–PACKARD marks. We agree with Packard that the Board erred in its analysis of this *DuPont* factor. The similarity or dissimilarity of the marks in their entirety is to be considered with respect to appearance, sound, and connotation. *See DuPont,* 476 F.2d at 1361, 177 USPQ at 567; *Olde Tyme Foods, Inc. v. Roundy's, Inc.,* 961 F.2d 200, 202–03, 22 USPQ2d 1542, 1544–45 (Fed.Cir.1992). All relevant facts pertaining to appearance, sound, and connotation must be considered before similarity as to one or more of those factors may be sufficient to support a finding that the marks are similar or dissimilar. *See Olde Tyme Foods,* 961 F.2d at 203, 22 USPQ2d at 1545; *In re Nat'l Data Corp.,* 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed.Cir.1985) (stating anti-dissection rule). Once all of the features of the mark are considered, however, it is not improper to state that, for rational reasons, more or less weight has been given to a particular feature of the mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. *See In re Nat'l Data Corp.,* 753 F.2d at 1058.

We agree with Packard that the Board improperly dissected the marks. In this case, the Board only considered the similar commercial impression of part of the marks—the shared word PACKARD—before concluding that the marks were similar. *See Hewlett–Packard,* slip op. at 4–5, 1999 WL 792477. However, the Board failed to make any findings at all as to the appearance or sound of the marks, and without any explanation, considered only the PACKARD portion of HEWLETT–PACKARD. To be sure, the Board stated that it had considered the marks in their entireties. *See id.* at 5,

1999 WL 792477. But this statement, absent further explanation of the agency's reasoning, is simply insufficient for proper review of PTO factfinding. Judicial review under the substantial evidence standard, *see Gartside,* at 1315, 203 F.3d 1305, 53 USPQ2d at 1775, can only take place when the agency explains its decisions with sufficient precision, including the underlying factfindings and the agency's rationale. Only then can this court engage in reasoned review of agency decision making, and thus provide the deference that this court must properly give to the PTO's factual determinations. *See Zurko,* 527 U.S. at 165, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d at 1937; *Gartside,* 203 F.3d at 1315, 53 USPQ2d at 1775. Accordingly, we vacate the Board's decision on this *DuPont* factor, and remand the case. On remand, the Board will have the opportunity to make the relevant findings as to the similarity or dissimilarity of the appearance, sound and connotation of the marks as a whole.

Moreover, although the Board correctly noted that it is proper to give greater weight to the PACKARD portion of the PACKARD TECHNOLOGIES mark on the ground that the word "technology" is highly suggestive/merely descriptive with respect to the services at issue, *see National Data Corp.,* 753 F.2d at 1058, 224 USPQ at 751 (stating that one commonly accepted rationale for giving less weight to a portion of a mark is that it is descriptive or generic with respect to the involved good or service), it completely failed to consider the appearance and sound of the mark as a whole. Although it is proper to indicate that more weight is given to a particular component of the mark—the meaning of PACKARD in this case—that does not excuse consideration of the other components of the mark as a whole. *See Sleepmaster Products Co. v. American Auto–Felt Corp.,* 44 C.C.P.A. 784, 241 F.2d 738, 741, 113 USPQ 63, 66 (CCPA 1957) (noting that although "Sleep", "Dream", and "Rest" are suggestive in meaning, it is proper to analyze the SLEEPMASTER,

RESTMASTER and DREAMMASTER marks as a whole when considering sound and appearance); *see also National Data Corp.,* 753 F.2d at 1058, 224 USPQ at 751 (explaining the effect of disclaimer and descriptive words in likelihood of confusion analysis). The ultimate conclusion of similarity or dissimilarity of the marks must rest on consideration of the marks in their entirety. On remand, the Board will have the opportunity to provide findings as to the appearance and sound of the marks as a whole, and as to any rational reasons for emphasizing a particular portion of the mark when performing the analysis.

### B

The next *DuPont* factor we consider is the "relatedness of the goods." *DuPont,* 476 F.2d at 1361, 177 USPQ at 567; *accord In re Martin's Famous Pastry Shoppe, Inc.,* 748 F.2d 1565, 1566–67, 223 USPQ 1289, 1290 (Fed.Cir.1984). The Board found that Packard's services and HP's goods and services were "specifically different," *Hewlett–Packard,* slip op. at 5, 1999 WL 792477, but correctly noted that even if the goods and service were not related to each other in kind, the same goods and services could still be related in the mind of the consuming public as to the origin of the goods. *See id.* The Board went on to rely on its own law for the proposition that "likelihood of confusion may result from the use by different parties of the same or similar marks for goods, on the one hand, and in connection with services which deal with those goods on the other." *Id.* at 6, 1999 WL 792477 (citing *In re Peebles Inc.,* 23 USPQ2d 1795 (TTAB 1992); *INB Nat'l Bank v. Metrohost, Inc.,* 22 USPQ2d 1585 (TTAB 1992); *In re Mucky Duck Mustard Co., Inc.,* 6 USPQ2d 1467 (TTAB 1988)). Because HP's computers, software, printers, fax machines, computers and data processing systems and data acquisition systems are "all goods which would be used with the services in [Packard's] application," the Board concluded that Packard's services were related to HP's goods. *Id.* at 7, 1999 WL 792477. The Board did not consider the fact that two of HP's registrations describe some computer-related services.

■ Packard argues that the Board applied a legal test requiring that services that "deal with" or "use" the goods at issue *must* be treated as related services and goods. If Packard is correct, the Board misapplied the correct legal test, because the test is not that goods and services must be related if used together, but merely that that finding is part of the underlying factual inquiry as to whether the goods and services at issue—Packard's data processing services and HP's hardware products and computer consultant data processing services—can be related in the mind of the consuming public as to the origin of the goods. *See Recot,* 214 F.3d at 1328–29, 54 USPQ2d at 1898; *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.,* 648 F.2d 1335, 1336–37, 209 USPQ 986, 988 (CCPA 1981). However, we cannot discern from the Board's brief discussion of this issue whether Packard is correct in arguing that the Board applied the wrong legal test. We reach this conclusion because the Board's decision, as expressed in its written opinion, is opaque as to the precise legal standard applied on this *DuPont* factor. In order for correct appellate review to occur under our standard of review, the Board must take care to express clearly both the facts as it finds them and the law that it applies to those facts.

Thus, we vacate the Board's decision, and remand the case to the Board so that the Board may articulate its findings and rationale as it considers the relevant evidence of record on this question. *See, e.g., Recot,* 214 F.3d at 1328, 54 USPQ2d at 1898 (noting that evidence that large food manufacturing companies sold both human and pet foods is relevant evidence of whether a consumer would be likely to think that applicant's dog treats were related to opposer's human food products); *Tuxedo Monopoly,* 648 F.2d at 1336–37, 209 USPQ at 988 (noting that evidence of extensive licensing supported conclusion

that products were related); *In re Seiler,* 48 C.C.P.A. 1001, 289 F.2d 674, 675, 129 USPQ 347, 347–48 (CCPA 1961) (finding that caterers were likely to sell specialty food products as well as to offer catering services supported conclusion that catering services and food products were related). We further note that the Board did not consider the fact that two of HP's registrations describe some computer-related services. On remand, the Board will have the opportunity to examine all of the relevant evidence of record while analyzing this *DuPont* factor.

■ Packard also argues that the Board erred when it failed to consider the evidence demonstrating that Packard's planned services pertain to electronic transmission of data to provide commercial printing services. In determining likelihood of confusion, however, the question of registrability of an applicant's mark must be decided on the basis of the identification of goods or services set forth in the application, regardless of what the record may reveal as to the particular nature of applicant's goods, the particular channels of trade, or the class of purchasers to which sales of the goods or services are directed. *See Octocom Sys., Inc. v. Houston Computer Servs.,* 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed.Cir.1990). Packard's registration broadly describes electronic data processing, and contains no restrictions limiting the services to electronic transmission of data to provide commercial printing services. Thus, the Board correctly assigned no weight to Packard's arguments narrowly characterizing the nature of the services it plans to offer as limited to electronic transmission of data for commercial printing services.

C

■ The eighth *DuPont* factor is the length of time during and conditions under which there has been concurrent use without evidence of actual confusion. *See DuPont,* 476 F.2d at 1361, 177 USPQ at 567; *Olde Tyme Foods,* 961 F.2d at 204–05, 22 USPQ2d at 1545–46. Before the Board, Packard profferred evidence of long-term

use of its PACKARD mark for computer services without actual confusion with HP's marks. According to Packard, the Board considered only the "PACKARD" component of its PACKARD TECHNOLOGIES mark when analyzing the first *DuPont* factor, the similarity or dissimilarity of the marks. Packard asserts that it follows from the Board's sole focus on the PACKARD component of its PACKARD TECHNOLOGIES mark that the Board should consider Packard's evidence of many years of concurrent use of its related mark, PACKARD for computer services, with no actual confusion with HP's marks for computer hardware and computer consulting services. The Board disagreed, concluding that only use of the PACKARD TECHNOLOGIES mark was relevant to the concurrent use factor. *See Hewlett–Packard,* slip op. at 8, 1999 WL 792477.

Our holding that the Board may not dissect the HEWLETT–PACKARD mark and consider only PACKARD as it related to Packard's application moots Packard's argument that the Board must consider its previous use of its PACKARD mark for computer services. On remand, the Board must perform its analytic measurements by applying HEWLETT–PACKARD to Packard's application. We express no view on any argument that Packard might seek to make, on remand, based on its previous use of its PACKARD mark for computer services.

D

■ The fifth *DuPont* factor, fame of the prior mark, when present, plays a "dominant" role in the process of balancing the *DuPont* factors. *See Recot,* 214 F.3d at 1327–28, 54 USPQ2d at 1897–98; *Kenner Parker,* 963 F.2d at 352, 22 USPQ2d at 1456 (citing *Sure–Fit Products Co. v. Saltzson Drapery Co.,* 45 C.C.P.A. 856, 254 F.2d 158, 160, 117 USPQ 295, 296 (CCPA 1958)). Famous marks thus enjoy a wide latitude of legal protection. *See Kenner Parker,* 963 F.2d at 352–53, 22 USPQ2d at 1456. The Board held that HP did not

proffer any evidence in support of its argument that its marks are famous, and therefore, the Board declined to find that the HP mark was famous. In its brief to this court, HP does not argue that the Board erred in not treating HP's mark as famous. At oral argument, however, counsel for HP suggested that the Board might have taken judicial notice of HP's fame, based on the proffered registration of HP's house mark. At oral argument, in response to questions from the bench as to why HP had failed to make any record at the Board to support a fame argument, the question arose as to whether judicial notice should have been taken of the fame of the HP mark. This court has, on one occasion in the past, taken judicial notice of the fame of a mark when considering a Board decision on appeal. *See B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed.Cir.1988). In that case, however, the request for judicial notice was made in the briefs, and not at the late stage of oral argument, as is the case here. We consequently decline to consider whether to take judicial notice of the fame of HP's marks. *See Henry v. Department of Justice*, 157 F.3d 863, 865 (Fed.Cir.1998) (stating that arguments raised for the first time at oral argument come too late). Therefore, we have no occasion today to consider whether our authority to take judicial notice of a mark's fame, for the first time on appeal, survives in the light of *Dickinson v. Zurko*, 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d 1930, 1937 (1999), and our need to faithfully follow the rule of *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

■ We hold that the Board correctly declined to consider the fame factor. Our caselaw has consistently stated that the conclusion that a mark is famous is based on several important factual findings. *See DuPont*, 476 F.2d at 1361, 177 USPQ at 567 (indicating that the sales, advertising, and length of use of the mark are to be considered when evaluating the fame of the mark); *Recot*, 214 F.3d at 1326, 54 USPQ2d at 1896 (describing relevant evidence of record supporting conclusion that the FRITO–LAY mark is famous). That the fame factor is based on underlying factfinding dictates that relevant evidence must be submitted in support of a request for treatment under the fame factor. This responsibility to create a factual record is heightened under the more deferential standard that this court must apply when reviewing PTO factfinding. *See Zurko*, 527 U.S. at 165, 119 S.Ct. 1816, 50 USPQ2d at 1937; *Gartside*, 203 F.3d at 1315, 53 USPQ2d at 1775. This is because judicial review under the substantial evidence standard, *see Gartside*, 203 F.3d at 1314, can only take place when the agency explains its decisions with precision, including the underlying factfindings and the agency's rationale. This necessarily requires that facts be submitted to the agency to create the record on which the agency bases its decision. Because HP did not proffer such evidence in support of its argument that its marks are famous, the Board properly declined to address this issue.

## III

■ Packard perceives an additional flaw in the Board's decision. Specifically, Packard asserts that it profferred evidence that its planned trade channels and customer classes differed from those of HP, yet the Board failed to consider this evidence. *See DuPont*, 476 F.2d at 1361, 177 USPQ at 567 (describing channel of trade and class of customer factors). Packard made the same argument concerning the relatedness of its services to HP's goods, and the Board properly rejected Packard's argument, as noted above. Specifically, the Board did not err by looking to the identification of the services set forth in Packard's application. *See Octocom*, 918 F.2d at 942, 16 USPQ2d at 1787 (Fed.Cir.

1990). When the registration does not contain limitations describing a particular channel of trade or class of customer, the goods or services are assumed to travel in all normal channels of trade. *See Canadian Imperial Bank of Commerce v. Wells Fargo Bank, N.A.,* 811 F.2d 1490, 1492, 1 USPQ2d 1813, 1814–15 (Fed.Cir.1987). The Board properly based its analysis on Packard's registration, which contains no restrictions as to a particular class of consumer or channel of trade, and assumed that applicant and opposer's goods and services may be marketed "in some of the same manners" to the same classes of purchasers. *Hewlett–Packard,* slip op. at 8, 1999 WL 792477. We perceive no reversible error in the Board's treatment of these *DuPont* factors.

## CONCLUSION

For the reasons stated above, we vacate the Board's decision and remand the case to the Board for further proceedings consistent with this decision.

## COSTS

No costs.

## VACATED AND REMANDED